IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Megan Largent, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Case No. 14 CV 50030 |
| v. | ) ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Megan Largent, brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision denying her social security disability benefits. For the reasons set forth below, the decision is remanded.

## I. INTRODUCTION

This Court has repeatedly recognized that applicants for social security disability benefits sometimes are not sympathetic, likeable or entirely credible. *Swagger v. Colvin*, 2015 U.S. Dist. LEXIS 151502, at *1-2 (N.D. Ill. Nov. 4, 2015); *Koelling v. Colvin*, 2015 U.S. Dist. LEXIS 140754, at *2 (N.D. Ill. Oct. 16, 2015). But, despite these attributes, administrative law judges must still properly follow the statutes, regulations and case-law in determining whether these applicants are nonetheless entitled to benefits.

This case is a good example of not only the unsavory character of the claimant, but also the flawed analysis used to justify the denial of benefits.

1

First, regarding Plaintiff, she is a criminal: she drove under the influence and used cocaine. She failed to comply with the conditions of her probation and escaped her work release program because she "did not like how it was and . . . didn't really want to do it. . ." R. 27. There is evidence that she is not seeking to improve her situation. For example, she rarely keeps her appointments with her treaters. There is also evidence that she exhibits drug seeking behavior. At the time of her hearing, she was 26 years old with only a minimal work history. She also claims to be very antisocial, avoiding nearly all contact with others, but somehow is still able to obtain and use cocaine as well as become pregnant three times. At times, Plaintiff's testimony was contradictory and less than credible.

Second, regarding the administrative law judge's decision, among other things, it failed to properly apply the treating physician's rule – a rule explained in great detail by the Administration's own regulations and publications. 20 C.F.R. § 416.927(c); SSR No. 06-03p. Likewise, the decision contradictorily rejects Plaintiff's statements to her treaters because they were "subjective," but then, without explanation, uses Plaintiff's other subjective statements to support the denial of benefits. *See Walls v. Colvin*, 2015 U.S. Dist. LEXIS 154143, at *9 (N.D. Ill. Nov. 13, 2015). Similarly, the decision rejects low GAF scores that might support the granting of benefits, but then, again without explanation, relies on only slightly better GAF scores as a basis to deny benefits. *See Vandiver v. Colvin*, 2015 U.S. Dist. LEXIS 163328, at *16 (N.D. Ill. Dec. 7, 2015).

As it has repeatedly done in similar cases, the Court remands the case without suggesting that the Commissioner must reach a particular conclusion.

## II. BACKGROUND[1]

On October 4, 2010, Plaintiff filed an application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, alleging a disability beginning on August 1, 2005. R. 176. Plaintiff asserted that her bipolar disorder and anxiety limited her ability to work. R. 202. At the time of filing her application, Plaintiff listed that she was taking Buspar for her anxiety and Seroquel for her mood swings. R. 204. Plaintiff was 20 years old at the time of the alleged onset date and last worked in 2008. R. 176, 221. On January 13, 2012, the Administrative Law Judge ("ALJ") held an initial hearing to review the Social Security Administration's denial of Plaintiff's request for benefits. After the hearing, the ALJ ordered a second consultative psychological examination because Plaintiff was not seeking regular treatment. R. 60-82. A supplemental hearing was held on October 10, 2012. R. 23-59. At both hearings, Plaintiff was represented by counsel.

At the initial hearing with the ALJ on January 13, 2012, Plaintiff testified that she was 26 years old, received a GED and lived with her father. R. 64. In 2000, she attempted suicide and was hospitalized in the psychiatric ward as a result. R. 65. Plaintiff did not drive, and her medical records revealed that her license was revoked in 2005 after driving under the influence. R. 66, 324.

---

[1] The following facts are only an overview of the medical evidence provided in the administrative record.

Plaintiff's father would take her to the store about once a week. R. 66-67. Plaintiff explained that she was very antisocial and only socialized with her parents, a cousin and her therapist because she was paranoid, distrusted others, and even accused her previous boyfriend of sleeping with her mother. R. 66-68, 76-77, 374.

Plaintiff testified that since approximately 2010, she rarely left her bedroom and spent most of her time reading, journaling and watching television. R. 69, 74, 80. Plaintiff described her unpredictable manic or depressed mood swings and insomnia, despite the use of medications. R. 71. She also described weekly crying fits, along with anxiety and panic attacks. R. 78-79. Plaintiff testified that she could not concentrate or complete tasks because she became distracted or uninterested after about twenty minutes. R. 71, 80. Plaintiff testified that she used the internet periodically, but did not use Facebook. R. 72. Plaintiff also previously attended church, but has not done so since approximately 2011. R. 67.

Plaintiff testified to seeing a therapist at Catholic Charities since approximately 2010, but noted that she rarely kept her weekly appointments because it was hard for her to leave her house. R. 65. At the time of the hearing, Plaintiff was taking Seroquel for her bipolar disorder and mood swings. R. 71. Plaintiff also explained that she was prescribed Ativan for her anxiety and other medications, but she could not afford them. R. 71-72.

Plaintiff testified that she began using cocaine in 2003. R. 75. At the time of the hearing in January 2012, Plaintiff testified that except for a two-day relapse, she had been sober since approximately May 2011. R. 69-70. Plaintiff also testified

4

that she had two children that she gave up for an open adoption due to her substance abuse, but she did not visit her children because it was too difficult for her. R. 81, 325. Plaintiff was also currently pregnant with her third child at the time of hearing. R. 437 ("The client reports her baby is due Dec. 3 or 4, 2012.").

On October 10, 2012, the ALJ held a supplemental hearing where Plaintiff, Medical Expert Dr. Mark Oberlander and Vocational Expert Dr. Craig Johnston ("VE") testified. R. 24. At this hearing, the ALJ summarized the previous hearing and specifically inquired about Plaintiff's record of community service. R. 26-27. Plaintiff testified that she was ordered to complete 400 hours of community service after she left a work release program without permission. R. 27, 30. Plaintiff completed these hours from November 2009 until November 2010 and worked in a church vacuuming the pews and cleaning out restrooms. R. 28-29. The ALJ also inquired about Plaintiff's Facebook use based on her statement at the first hearing that she did not use it, which was inconsistent with a statement during her December 2010 examination where she referenced using it. R. 31. Plaintiff explained that in 2010, she tried out Facebook and did not like it so she stopped. R. 31. By the time of the second hearing, Plaintiff resumed using Facebook to keep in touch with family. R. 31.

As to Plaintiff's cocaine use, she testified that she had last used in May 2012, but had been sober since. R. 31-32. Plaintiff also testified that she started seeing a psychiatrist at Rosecrance in approximately June 2012, where she was newly diagnosed with a personality disorder. R. 32, 383. Plaintiff was prescribed

5

Risperdal and Zoloft, but she did not believe that the medications were helping her. R. 32. Plaintiff explained that she was functioning at the same level or worse than she was at the initial hearing on January 13, 2012. R. 32. Upon questioning by Plaintiff's counsel, Plaintiff testified that she would leave the house no more than twice a month to go to the store and could only maintain concentration for approximately five or ten minutes. R. 33-34. Plaintiff continued to have crying fits approximately twice a week and would not even leave her bed. R. 34-35, 37. She also had aggressive behavior toward others and had hallucinations such as shadows in her living room. R. 36-37.

The ALJ called Dr. Oberlander to testify as an impartial medical expert in the field of clinical psychology. R.39, 409. Dr. Oberlander opined that Plaintiff exhibited: (1) affective disorder with bipolar syndrome under Listing 12.04; (2) anxiety disorder that had never been formulated, but the evidence in Plaintiff's file and her testimony supported sufficiently severe and frequent panic attacks; (3) posttraumatic stress disorder under Listing 12.06; (4) personality disorder under Listing 12.08; (5) possible borderline personality disorder; (6) substance use and abuse of cocaine and cannabis under Listing 12.09, with Plaintiff's last documented use of cannabis and cocaine in April 2012 and the only documented clean urine sample from July 2012. R. 41-42. Dr. Oberlander found significant a diagnostic formulation from Rosecrance in July 2012 that assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 50, noting that Plaintiff had been on and off medication for two years and that "'drug use dominates her mental illness.'"

R. 43, 383, 400. Dr. Oberlander pointed out that Plaintiff's medical records revealed that she only attended counseling sporadically and that her testimony that she only left the house twice a month for shopping would not support her claim that she was also attending psychiatric treatment or counseling. R. 43-44. Dr. Oberlander testified that Plaintiff's medications at the time of the hearing were Zoloft and Risperdal, and she was previously prescribed lithium, which he opined would have been more consistent and effective in treating Plaintiff's issues, but she stopped using it. R. 44.

In evaluating the B criteria for Plaintiff's mental impairments, Dr. Oberlander testified that from October 4, 2010, the date of Plaintiff's application, until the date of the hearing, he did not believe she satisfied the B criteria because her capacity to engage in activities of daily living, to maintain social interaction, and for concentration, attention and memory were only moderately impaired. R. 44-45, 47. Additionally, Plaintiff had no episodes of decompensation for longer than two weeks. R. 45, 47. In response to this opinion, the ALJ asked whether Dr. Oberlander agreed with the GAF score of 48 assigned by Plaintiff's treating psychiatrist, Dr. Shahina Jafry, which the ALJ interpreted as indicating a "more serious disruption of functioning." R. 46. Dr. Oberlander responded that Dr. Jafry had only seen Plaintiff on one occasion, and that Plaintiff saw a counselor at Catholic Charites more often and he assigned a GAF score of 68/75. R. 46, 359. However, Plaintiff's counsel pointed out treatment notes provided by Catholic Charities, which indicated Plaintiff was more restricted that the GAF score implied.

7

R. 48. Dr. Oberlander admitted there were discrepancies between the GAF score and the Mental Residual Functional Capacity ("RFC") report the counselor provided, which identified Plaintiff as having marked and extreme impairments in several categories including maintaining social functioning and concentration. R. 49-50, 360-61. It also identified Plaintiff's ability to perform activities of daily living as only mildly impaired. R. 49-50, 360. However, Dr. Oberlander admitted that a GAF score of 45 to 50 would indicate serious impairment in functioning. R. 50-51.

On November 30, 2012, the ALJ issued his ruling finding that Plaintiff was not disabled. R. 9-17. The ALJ found that Plaintiff had not engaged in substantial gainful activity since Plaintiff's date of application, October 4, 2010. R. 11. The ALJ also found that Plaintiff had the following severe impairments: bipolar disorder, posttraumatic stress disorder, personality disorder and polysubstance dependence. R. 11. However, the ALJ determined that Plaintiff's impairments did not meet or medically equal Listings 12.04, 12.06, 12.08 or 12.09. R. 11. The ALJ concluded that Plaintiff had the RFC to perform a full range of work at all exertional levels, but was limited to unskilled, routine work that stayed the same day-to-day, was learnable on short demonstration, was not measured by a fixed hourly performance and did not involve public contact, team coordination or frequent communication. R. 12.

### III. LEGAL STANDARD

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a

8

rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Additionally, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014) ("In the Seventh Circuit, an ALJ's decision can be supported by substantial evidence – or even a preponderance of the evidence, as it is here – but still will be overturned if the ALJ fails to build a 'logical

9

bridge' from the evidence to her conclusion." (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996))); *Jensen v. Colvin*, No. 10 CV 50312, 2013 U.S. Dist. LEXIS 135452, at *33-34 (N.D. Ill. Sept. 23, 2013).

## IV. DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed or remanded because the ALJ: (1) failed to sufficiently explain why Plaintiff's impairments did not meet or equal the criteria for Listings 12.04, 12.06 or 12.08; (2) mischaracterized the GAF scores in the record when determining Plaintiff's RFC; and (3) improperly analyzed Plaintiff's addiction to illegal substances. The Court finds that remand is warranted based on Plaintiff's first two arguments as they relate to the ALJ's failure to provide a sufficient explanation for his assessment of the medical opinions and evidence in the record.[2]

The ALJ evaluated Plaintiff's mental impairments under Listing 12.04 for affective disorder with bipolar syndrome, Listing 12.06 for posttraumatic stress disorder and Listing 12.08 for personality disorder.[3] To meet the requirements for each of these listings, the claimant must satisfy the paragraph A criteria for each of these listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(3), 12.06(A)(5), 12.08(A)(6). Additionally, the claimant must satisfy the paragraph B criteria by demonstrating that the impairment resulted in a least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining

---

[2] Although the Court does not address the third argument, on remand, the administrative law judge should properly and fully address the drug abuse issue lurking in the background of this claim. *See Koelling*, 2015 U.S. Dist. LEXIS 140754, at *29-31.

[3] The ALJ also evaluated Plaintiff's mental impairments under Listing 12.09 for polysubstance dependence, but Plaintiff does not argue that she met this listing on appeal.

10

social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B), 12.08(B).

The ALJ ultimately found that Plaintiff did not meet the paragraph B criteria for any of her mental impairments. R. 12. The ALJ determined that Plaintiff had no more than a mild limitation in her activities of daily living and had moderate difficulty in social functioning and concentration, persistence or pace and only one to two episodes of decompensation of extended duration. R. 12. In support of this finding, the ALJ relied on the fact that Plaintiff cooked and cleaned for her sick father, wanted to be a good mother to her unborn child, was in the process of looking for her biological parents and used Facebook to keep up with friends. R. 12. The ALJ also noted that during Plaintiff's consultative examination, she provided "adequate find of knowledge answers" and could count backward by sevens, which showed her preserved concentration. R. 12. The ALJ also noted that Plaintiff could think abstractly and was able to remember information after a thirty-minute delay. R. 12.

Although this is the extent of the ALJ's listing analysis, the ALJ expanded on his evaluation of the medical evidence when determining Plaintiff's RFC. R. 13-15. The ALJ afforded consultative examiner Dr. Kelly Renzi's opinions substantial weight because, according to the ALJ, she had a longitudinal perspective of Plaintiff's functioning by having had the opportunity to examine Plaintiff both in December 2010 and February 2012 and because she provided detailed mental

status findings. R. 13, 15. Apparently, in the ALJ's view, two examinations establish a longitudinal perspective, whereas a single examination does not. The ALJ interpreted Dr. Renzi's assigned GAF score of 50 as corresponding with "moderate functional impact as far as the ability to interact with others or adapt to occupational demands." R. 13, 15. The ALJ also assigned substantial weight to the opinions of the non-examining, state-agency consultants that evaluated Plaintiff's mental impairments under Listings 12.04 and 12.09 and determined that Plaintiff had only moderate difficulties in the paragraph B criteria. R. 329-349. The ALJ found these opinions supported by Plaintiff's participation in community service and consistent with the record as a whole. R. 15.

In contrast, the ALJ gave minimal weight to the GAF score of 48 assigned by Plaintiff's treating psychiatrist at Rosecrance, Dr. Jafry, noting that Dr. Jafry saw Plaintiff only once and her evaluation provided "sparse mental status comments." R. 15. The ALJ also determined that the GAF score was inconsistent with Plaintiff's community service work and Dr. Jafry's conclusion that Plaintiff's psychosis was mild. R. 15. The ALJ also assigned limited weight to Dr. Oberlander's opinions at the hearing, finding that he was not familiar with Plaintiff's "longitudinal specifics." R. 15.

In reviewing the ALJ's decision, this Court finds that the ALJ failed to give adequate reasons for rejecting the opinion of Dr. Jafry and relying on the opinions of Dr. Renzi and the state-agency consultants, who in particular did not even evaluate Plaintiff's impairments under Listings 12.06 and 12.08. In rejecting Dr. Jafry's

12

assigned GAF score of 48, the ALJ determined the score was inconsistent with Dr. Jafry's finding that Plaintiff only had mild psychosis. There is no medical evidence in the record to indicate that a GAF score of 48 would be inconsistent with mild psychosis. Additionally, Dr. Oberlander did not testify to this effect at the hearing, but even if he did, the ALJ gave his opinion minimal weight. The ALJ may not play doctor and interpret the evidence without an opinion or evidence to support the conclusion. *See Engstrand v. Colvin*, 788 F.3d 655, 660-61 (7th Cir. 2015); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

The ALJ also relied heavily on Plaintiff's history of community service work throughout his opinion and specifically to reject Dr. Jafry's assigned GAF score. Yet, Plaintiff' completed her 400 hours of community service from November 2009 through November 2010, and Plaintiff's SSI application was filed on October 4, 2010. A claimant can only collect SSI benefits the month following the date of the application, regardless of how long she was disabled. *See* 20 C.F.R. § 416.335. The Commissioner admits this much in her brief stating, "[e]vidence of [Plaintiff's] condition prior to [the date of her application] is arguably of no value as she cannot be found disabled prior to the filing of her application." Defendant's Memorandum at 2-3, Dkt. 14. Therefore, Plaintiff performed her community service work for only one month during the period in question relating to her disability. Additionally, Plaintiff's community service work ended in November 2010 and Dr. Jafry did not evaluate Plaintiff until July 2012. Yet, both the ALJ and the

13

Commissioner placed great weight on Plaintiff's community service work to discount the opinion of Dr. Jafry and support the opinions of Dr. Renzi and the state-agency consultants, who also evaluated Plaintiff after her community service work ended.

Moreover, and more fundamentally, the ALJ failed to properly apply the bifurcated, two-step process in analyzing medical source opinions. *See Vandiver*, 2015 U.S. Dist. LEXIS 163328, at *6-7. The Social Security Regulations require an ALJ to "consider *all* of the following factors in deciding the weight [to] give to *any* medical opinion": (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c) (emphasis added); 20 C.F.R. § 416.927(c)(2)(i)-(ii), (c)(3)-(6). These are the "checklist factors." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). Despite the mandatory nature of these regulations, the ALJ only considered a few of the checklist factors in passing by pointing out that Dr. Jafry[4] only saw Plaintiff once. It is true that Dr. Jafry only evaluated Plaintiff in September 2012; however, Dr. Renzi only saw Plaintiff twice and the most recent examination was back in February 2012. The only other nod to the checklist factors is that the ALJ determined that Dr. Jafry did not provide enough support for her opinion. However, in light of the ALJ's unsupported reliance on Plaintiff's community service

---

[4] The Court notes that the Commissioner does not challenge Plaintiff's claim on appeal that Dr. Jafry is Plaintiff's treating psychiatrist.

14

work and determination regarding mild psychosis, the Court does not find this analysis sufficient to adequately justify the weight the ALJ assigned to Dr. Jafry's opinion. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (directing the ALJ to "explicitly" consider the checklist of factors and provide reasons for the weight given to the treating physicians' opinions on remand); *Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, at *25 (N.D. Ill. Aug. 4, 2015) (suggesting that the language provided in § 404.1527(c) is mandatory). ALJs should not give vague, passing nods to only a few of the checklist factors. *Vandiver*, 2015 U.S. Dist. LEXIS 163328, at *8; *Walls*, 2015 U.S. Dist. LEXIS 154143, at *12.

Similarly, the ALJ relied on Dr. Renzi and state agency consulting opinions, but only sparingly addressed one or two of the checklist factors in doing so. Additionally, given that the state agency physicians did not examine Plaintiff, the ALJ's heavy reliance on the fact that Plaintiff only saw Dr. Jafry once seems disingenuous. This is in addition to the fact that the ALJ outlined inconsistencies in Plaintiff's testimony relating to how often she left her room, her community service work and use of Facebook to determine that Plaintiff could not "offer subjective information on a dependable basis, which logically would affect the ability of a treating psychiatrist to assess whether medication was effective; or for that matter, for attending therapists to assess whether she was progressing in counseling as far as internalizing coping strategies or adaptive skill." R. 14. Nevertheless, the ALJ gave substantial weigh to the opinions of Dr. Renzi and the state agency consultants, who also relied on Plaintiff's subjective statements to

15

determine her functional capacity. *See Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("psychiatric assessments normally are based primarily on what the patient tells the psychiatrist, so that if the judge were correct, most psychiatric evidence would be totally excluded from social security disability proceedings"); *Korzeniewski v. Colvin*, 2014 U.S. Dist. LEXIS 51004, *21 (N.D. Ill. Apr. 14, 2014) ("All diagnoses, particularly those involving mental health conditions, require consideration of the claimant's subjective symptoms."); *see also Retlick v. Astrue*, 930 F. Supp. 2d 998, 1008-09 (E.D. Wisc. 2012). The ALJ also relied on statements Plaintiff made to her therapists at Rosecrance that she was trying to be a good mother to her new child and was cooking and cleaning for her sick father when determining whether Plaintiff satisfied the B criteria for the listings. Essentially, the ALJ relied on Plaintiff's subjective statements when those statements supported a denial of benefits, but ignored Plaintiff's subjective statements when those statements supported granting benefits. *See Walls*, 2015 U.S. Dist. LEXIS 154143, at *9 ("Although the Government claims that Dr. Rone improperly relied on subjective allegations, the Government does not consider whether other doctors, whose opinions were credited, also did so.").

Nevertheless, the ALJ did not specifically indicate whether he considered the Mental RFC determinations provided by Plaintiff's Rosecrance therapist when evaluating Plaintiff's paragraph B criteria, despite the fact that these were the most recent in Plaintiff's medical record. *See* R. 398. The only other sources that provided specific Mental RFC determinations were the state-agency consultants

16

and Catholic Charities; however, the state-agency consultants only evaluated Plaintiff under Listings 12.04 and 12.09. Additionally, the ALJ assigned minimal weight to the therapist at Catholic Charities because he was not an acceptable medical source and because he found the functional limitations inconsistent with the assigned GAF score. *See* R. 14-15, 329-30, 359-361. Therefore, the ALJ only relied on the state-agency consultants' Mental RFC, despite the fact that evaluations by therapists, even if not acceptable medical sources, may still be considered to determine the severity of Plaintiff's impairments. *See* 20 C.F.R. § 416.913(a), (d).

In addition to the ALJ's inconsistent reasoning used to evaluate the medical opinions in the record, the ALJ's evaluation of the GAF scores in the record is also not supported by substantial evidence. In particular, the GAF scores assigned by Dr. Jafry and Dr. Renzi[5] were close in range, 48 and 50 respectively. Yet the ALJ relied on Dr. Renzi's score and not Dr. Jafry's and furthermore interpreted Dr. Renzi's and other therapists' assigned GAF scores of 50 to mean only moderate functional impact. R. 13-15. A GAF score between "41 and 50 indicates 'serious symptoms … OR any serious impairment in social, occupational, or school functioning.'" *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* 34 (4th ed. 2000)); *see also Voigt v. Colvin*, 781 F.3d 871, 874 (7th Cir. 2015) ("A score between 41 and 50 signifies serious psychiatric

---

[5] Dr. Renzi provided a GAF score of 45 during her December 2010 evaluation; however, the ALJ mostly relied on the GAF score of 50 that Dr. Renzi later provided in February 2012.

17

illness."). Dr. Oberlander even testified that a GAF score of 50 would indicate serious impairment in functioning. R. 50-51. Generally, such a mischaracterization of the GAF score would not be significant because a GAF score of 51 to 60 indicates moderate symptoms and Plaintiff's GAF score was on the border between moderate and serious. However, this was not the only error in the ALJ's analysis. Furthermore, the ALJ mischaracterized several GAF scores provided throughout Plaintiff's treatment and relied on numerous GAF scores throughout his analysis when determining how to weigh the medical evidence and assess Plaintiff's functional limitations.

Despite the ALJ's reliance on the mischaracterized GAF scores throughout his analysis, the Commissioner argues that this error does not require remand because a GAF score is intended to make treatment decisions, not disability determinations. Defendant's Memorandum at 10, Dkt. 14. Accordingly, the Commissioner had declined to endorse the use of GAF scores. *Id.*[6] It is true that an ALJ is not bound by the GAF scores provided in record and that the fifth edition of the Diagnostic and Statistical Manual ("DSM") published in 2013 no longer uses GAF scores because of their unreliability. *See Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (noting that the DSM has abandoned the use of the GAF scale); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that a GAF score

---

[6] The Commissioner also cites to a printout from the State of Florida to assert that the ALJ's characterization of a GAF score of 50 as a moderate limitation as "not entirely inaccurate" because a score of 48 to 50 indicates that an individual has serious impairment in one of eight "Group D criteria." Defendant's Memorandum at 11, Dkt. 14. The Court is not persuaded by this argument because the Commissioner has failed to cite any regulation or precedential authority to support this assertion.

does not necessarily reflect a doctor's opinion of functional capacity because the score measures severity of symptoms and functional level). However, the change to the DSM occurred after Plaintiff's evaluations and the ALJ's decision in this case. Moreover, the fact that the DSM and the Commissioner decline to endorse GAF scores is of little relevance to this case in light of the ALJ's heavy reliance on the GAF scores when determining Plaintiff's functional limitations. If the ALJ relies on GAF scores, the ALJ must do so in a consistent manner. The ALJ cannot credit a borderline GAF score, but then discredit a GAF score that falls slightly below it and in a different category. *See Vandiver*, 2015 U.S. Dist. LEXIS 163328, at *16 ("On remand, if the ALJ is going to rely on GAF scores, he should do so in a consistent way.").

Therefore, without a logical bridge between the evidence and the ALJ's conclusions, we must remand for further proceedings consistent with this opinion. On remand, the ALJ should apply the checklist factors to properly weigh each medical opinion in the record. The ALJ should also give careful consideration to ensure that the medical evidence supports his determinations. Given that remand is warranted on the issues outlined above, the Court need not analyze Plaintiff's remaining argument regarding the ALJ's analysis of her substance abuse. However, the ALJ should take the opportunity to clarify the record and explicitly determine whether Plaintiff's substance abuse was a material factor contributing to her mental impairments and functional limitations. *See Koelling*, 2015 U.S. Dist. LEXIS 140754, at *29-31. For example, in relation to Plaintiff's compliance with

prescribed medication, it is unclear whether the ALJ determined that Plaintiff was not compliant in light of her incredible report of side effects to her medications or if it was solely related to her substance dependence. *See* R. 14.

## V. CONCLUSION

For the reasons stated in this opinion, this Court finds that remand is warranted so that the ALJ may build a logical bridge between the evidence in the record and his ultimate conclusions. However, the Court expresses no opinion as to the ultimate determination of disability on remand. *See Moore v. Colvin*, 743 F.2d 1118, 1124 (7th Cir. 2014). When the ALJ commits fundamental errors, including failing to comply with the treating physician rule, the Court cannot affirm merely because the plaintiff's claim is weak and the Court possesses serious reservations regarding the plaintiff's claimed disability. *See Tucker v. Colvin*, 2015 U.S. Dist. LEXIS 149905, at *10-11 (N.D. Ill. Nov. 4, 2015). Accordingly, Plaintiff's motion for summary judgment (Dkt. 9) is granted, and the Commissioner's motion (Dkt. 14) is denied. The decision of the ALJ is remanded for further proceedings consistent with this opinion.

Date: January 5, 2016    By: _____
　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　United States Magistrate Judge